**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

UNITED STATES OF AMERICA,

                    Plaintiff,                  Criminal No.: 16-cr-20499-01, -02, -03

v.                                    Honorable Thomas L. Ludington

SCOTT MCQUARRIE,
DAVID MCQUARRIE, and
YVONNE MCQUARRIE,

                    Defendants.

_____/

**ORDER DENYING DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL**
**AND NEW TRIAL**

       Scott McQuarrie was indicted on June 13, 2016, with six counts alleging that he made false statements and converted collateral pledged for a loan he received from the Farm Service Agency (FSA). ECF No. 1. On June 8, 2017, a superseding indictment was returned which charged Scott McQuarrie with twelve counts and which named his parents, David Allen McQuarrie and Yvonne Evelyn McQuarrie, as co-Defendants in two counts. On November 1, 2017, a second superseding indictment was issued which charged the three Defendants with an additional two counts, for a total of fourteen counts. ECF No. 42. On January 10, 2018, and February 14, 2018, third and fourth superseding indictments were issued. ECF No. 76, 103. A trial on the fourth superseding indictment was held in late March of 2018.

       Two days before jury selection occurred, Scott McQuarrie filed a motion to dismiss Count Four of the fourth superseding indictment. ECF No. 130. Given the temporal proximity between the filing of the motion to dismiss and the beginning of trial, Count Four was severed. The jury acquitted Scott McQuarrie of Count Nine and convicted him of the remaining counts, leaving

Count Four as the only unresolved count. ECF No. 148.[1] David and Yvonne McQuarrie were each convicted of Counts Eleven, Twelve, and Fourteen, but acquitted of Count Thirteen. ECF No. 150, 152.

On April 11, 2018, Defendants David and Yvonne McQuarrie filed two joint motions. In the first, David and Yvonne McQuarrie move for a judgment of acquittal. ECF No. 166. In the second, they request a new trial. ECF No. 167. On the same day, Defendant Scott McQuarrie filed a motion for acquittal and a new trial. ECF No. 168. For the following reasons, all three motions will be denied.

**I.**

 Defendants' motions are governed by Federal Rules of Criminal Procedure 29 and 33. Rule 29(c) permits a criminal defendant to move for a judgment of acquittal within four days after a guilty verdict has been rendered. If the court determines pursuant to its own review of the evidence that "the evidence is insufficient to sustain a conviction," the court must enter a judgment of acquittal. Rule 29(a). This review of the sufficiency of the evidence is extremely favorable to the prosecution. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). In reviewing the jury's verdict, "both circumstantial and direct evidence" must be viewed "in a light most favorable to the prosecution." *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002). "Circumstantial evidence alone, if 'substantial and competent,' may support a verdict and need not 'remove every reasonable hypothesis except that of guilt.'" *United States v.*

---

[1] On May 7, 2018, the Court issued an order denying the motion to dismiss Count Four because the offense charged therein was not barred by the statute of limitations. ECF No. 181. A bench trial was held on May 22, 2018, and Scott McQuarrie was convicted of Count Four at its conclusion.

*Keeton*, 101 F.3d 48, 52 (6th Cir. 1996). "The government is entitled to the benefit of all reasonable inferences that can be drawn from the evidence." *United States v. Hofstatter*, 8 F.3d 316, 324 (6th Cir. 1993).

Pursuant to Rule 33(a), "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Such a motion may be granted if "the jury's verdict was against the manifest weight of the evidence." *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007). But "such motions are granted only 'in the extraordinary circumstance where the evidence preponderates heavily against the verdict.'" *Id.* at 592 (quoting *United States v. Turner*, 490 F.Supp. 583, 593 (E.D.Mich.1979)). In seeking a new trial based on the district court's refusal to sever defendants and/or counts for trial, the "defendant must show compelling, specific, and actual prejudice from a court's refusal to grant the motion to sever." *United States v. Saadey*, 393 F.3d 669, 678 (6th Cir. 2005).

Defendants can also seek a new trial by arguing that they were convicted pursuant to a duplicitous indictment. *See United States v. Kakos*, 483 F.3d 441, 444 (6th Cir. 2007). "An indictment is duplicitous if it sets forth separate and distinct crimes in one count." *United States v. Davis*, 306 F.3d 398, 415 (6th Cir. 2002). Duplicitous indictments are problematic because they permit a jury to "'find a defendant guilty on the count without having reached a unanimous verdict on the commission of any particular offense.'" *United States v. Shumpert Hood*, 210 F.3d 660, 662–63 (6th Cir. 2000) (quoting *United States v. Robinson*, 651 F.2d 1188, 1194 (6th Cir.1981)). "Duplicitous charges, however, are not necessarily fatal to an indictment." *Id.* at 662. If the issue is not raised before trial, then the inquiry focuses on "the harm stemming from the duplicitous indictment." *Kakos*, 483 F.3d at 444.

## II.

Because all three motions raise similar arguments, Defendants' motions will be considered and addressed simultaneously. The initial question is whether the evidence admitted at trial was sufficient for any rational trier of fact to convict. The next issue is whether certain evidentiary rulings made during trial necessitate acquittal or a new trial. The third question is whether David and Yvonne McQuarrie suffered specific and compelling prejudice because their motion for severance was denied. The fourth issue is whether the evidence the Government relied upon at trial for the mail and wire fraud counts constituted a variance from the indictment and bill of particulars and, relatedly, whether mail and wire fraud charges in the fourth superseding indictment were duplicitous. The final question is whether the Government committed misconduct during its closing statements.

### A.

After considering the evidence in a light most favorable to the prosecution, there is ample factual support for the jury's conclusions.

### 1.

As regards the Counts of the fourth superseding indictment which charge Scott McQuarrie with conversion, Scott McQuarrie argues that he should be acquitted because "it is axiomatic that one cannot convert that which they do not own." Scott McQuarrie Mot. at 2, ECF No. 168. He identifies no legal support for this assertion. And there was certainly no evidentiary support for the proposition that Scott McQuarrie did not own the collateral, much less that he disclosed that to the FSA. To the contrary, Scott McQuarrie met with Appraiser Jerry Rosenquist on December 28, 2009, to update the value of the property he was pledging for his restructured loan and represented that it was his. Gov. Ex. 2. ("In accordance with your request of December 17 2009, I have

completed an appraisal of the livestock and farm equipment in the ownership and possession of Scott McQuarrie, located at 9871 Spruce RD., Ossineke, MI 49766."). Similarly, Scott McQuarrie expressly represented his ownership of the collateral to FSA in the security agreement executed on July 20, 2011. Gov. Ex. 5 ("3. DEBTOR WARRANTS, COVENANTS, AND AGREES THAT: (a) Debtor is the absolute and exclusive owner of the above-described collateral . . . (e) Debtor will immediately notify Security Party of any material change in the collateral or in the collateral's location. . . .").

Moreover, the plain language of 18 U.S.C. § 658 does not require as an element of the crime that the defendant own the pledged collateral. *See id.* ("Whoever with intent to defraud, knowingly conceals, removes, disposes of, or converts to his own use or to that of another, *any property* mortgaged or pledged to, or held by, the Farm Credit Administration . . . .") (emphasis added). And the definition of conversion provides no support for Scott McQuarrie's argument. According to Black's, conversion involves an individual "depriv[ing] another of his property." Black's Law Dictionary, *Conversion*, (10th ed. 2014) (explaining that a person can convert another's property in several ways: "(1) by wrongly taking it, (2) by wrongly detaining it, and (3) by wrongly disposing of it"). The conduct which Congress criminalized in § 658 is depriving the FSA of the security it enjoys through its interest in the pledged collateral. The FSA can be deprived of that interest by any person who converts the pledged collateral, regardless of whether that individual owns the collateral. And, of course, Scott McQuarrie actually did represent that he owned the collateral.

Scott McQuarrie also argues that the "FSA waived their security agreement to allow Defendant to sell his livestock, crops and trade-up farm equipment," and so FSA lost any property interest it may have had. Scott McQuarrie provides no legal support for this contention, and it is

inconsistent with the plain language of 18 U.S.C. § 658. Again, Scott McQuarrie identifies no evidentiary support for this proposition. Although Scott McQuarrie advanced the argument to the jury, it was rejected.

Regardless, this theory is legally insufficient to operate as a defense. Section 658 criminalizes the following behavior: "Whoever with intent to defraud, knowingly conceals, removes, disposes of, or converts to his own use or to that of another, any property mortgaged or pledged to, or held by, the Farm Credit Administration . . . ." *Id.* There is no textual support for Scott McQuarrie's argument that conversion is noncriminal if the FSA was less than diligent in protecting its rights. Federal courts have repeatedly rejected this theory of defense as legally irrelevant. *See United States v. Lott*, 751 F.2d 717, 719 (4th Cir. 1985) (finding that there was sufficient evidence of intent to defraud "even if the FHA did lead Lott to believe that it knew of the advance and implicitly acquiesced in his retaining the funds"); *United States v. Mitchell*, 666 F.2d 1385, 1388 (11th Cir. 1982) ("The $15,000 advance constituted proceeds from crops and Mitchell's intentional application of that sum to his land rental payment is not excused by the understandable desire to maintain his farm as an ongoing operation."); *United States v. Berman*, 21 F.3d 753, 755 (7th Cir. 1994); *United States v. Gilbert*, 69 F.3d 538 (6th Cir. 1995) (citing *Lott* approvingly). The evidence admitted at trial was more than sufficient to permit the jury to conclude that Scott McQuarrie sold livestock, crops, and equipment which had been pledged as collateral to the FSA with intent to defraud.

## 2.

Scott McQuarrie does not expressly challenge the sufficiency of the evidence regarding the bankruptcy fraud convictions (Counts Eleven and Twelve). He does challenge several evidentiary rulings made during trial and argues that those rulings prevented him from advancing his preferred

defense. Those evidentiary challenges will be addressed below. Yvonne and David McQuarrie, however, argue that there was insufficient evidence for the jury to conclude that "David or Yvonne knew that Scott was withholding any information from the bankruptcy court" and so insufficient evidence to conclude that they acted with intent to defraud. ECF No. 166 at 5.

> David and Yvonne admit that

> a rational juror could find that Scott McQuarrie sold assets that were concealed from the bankruptcy court, that David McQuarrie assisted in the sale of some of these assets, and that money was placed in the financial accounts of David and Yvonne McQuarrie. Additionally, it is undisputed that David and Yvonne McQuarrie were aware of the bankruptcy filings of their son.

Def. Mot. Acquittal at 4, ECF No. 166.

Given these admissions (which could not reasonably be disputed given the evidence admitted at trial, *see* Gov. Resp. Br. at 4–5, ECF No. 178), Defendants' challenge to their conviction collapses. Defendants' only proffered explanation for why proceeds from the sale of Scott's assets were deposited in his parent's accounts is that he had long been in debt to them, in addition to the FSA. Even if true, that dynamic could not operate as a defense. Defendants have never identified any documents formalizing any loans, much less a security agreement. As such, David and Yvonne would have known (especially given their knowledge of Scott's first bankruptcy filing) that other creditors had superior interests to Scott's assets which were being sold and the proceeds which were being deposited in their accounts. Accordingly, a reasonable jury could have concluded that David and Yvonne cooperated with their son to conceal assets with the intent to defraud the bankruptcy court. Indeed, a reasonable jury could have viewed Defendants' arguments regarding Scott McQuarrie's debts to his parents as providing a motive for David and Yvonne to conceal Scott McQuarrie's assets from the bankruptcy court—that is, to recover their losses at the expense of Scott McQuarrie's other creditors.

**3.**

As to the mail fraud and wire fraud convictions (Counts Thirteen and Fourteen)[2], all three Defendants argue that the Government failed to identify evidence that the jurisdictional element (an interstate use of a wire or mail communication) was met. The elements of mail fraud and wire fraud are as follows: "(1) devising or intending to devise a scheme to defraud (or to perform specified fraudulent acts); (2) involving a use of the mails or wires; and (3) for the purpose of executing the scheme or attempting to do so. *United States v. Kennedy*, 714 F.3d 951, 958 (6th Cir. 2013) (quoting *United States v. Frost*, 125 F.3d 346, 354 (6th Cir.1997)). The Sixth Circuit has "interpreted the mail-fraud and wire-fraud statutes as having essentially the same elements, except for the use of the mails versus the wires." *Id.* at 958.

Importantly, "[a] defendant may commit mail fraud even if he personally has not used the mails." *Frost*, 125 F.3d at 354 (citing *United States v. Griffith*, 17 F.3d 865, 874 (6th Cir.1994)). "A mail fraud conviction requires only a showing that the defendant acted with knowledge that use of the mails would follow in the ordinary course of business, or that a reasonable person would have foreseen use of the mails." *Id.* In other words, there is no requirement that the defendant have actually intended that the mails (or wire) be used. *Id.* And, further, "'[t]he mailings may be innocent or even legally necessary.'" *Id.* (quoting *United States v. Oldfield*, 859 F.2d 392, 400 (6th Cir. 1988)). The use of the mails "'need only be closely related to the scheme and reasonably foreseeable as a result of the defendant's actions.'" *Id.* (quoting *Oldfield*, 859 F.2d at 400).

The precise nature of the scheme to defraud is at issue in the present motions and will be discussed below. In broad terms, however, the Government presented evidence that, after a home fire, Scott McQuarrie made an insurance claim for the value of the structure. The insurance

---

[2] David and Yvonne McQuarrie were each acquitted of Count Thirteen, charging mail fraud, but convicted of Count Fourteen, charging wire fraud. Scott McQuarrie was convicted of both counts.

company mailed a check for that claim to Scott McQuarrie, and that check was deposited in a supervised bank account controlled by FSA. He also made a claim for the contents of the home. The claim for lost contents was faxed from David McQuarrie's insurance agency in Michigan to the insurance company's office in Ohio. *See* Gov. Ex. 98. Later, Scott McQuarrie mailed additional documentation related to a replacement cost coverage claim from Michigan to an insurance agency in Des Moines, Iowa. Gov. Ex. 97. When it arrived there, the insurance agency scanned the paper documents and made them electronically available. *See* Gov. Ex. 100. The insurance company then mailed a check to Scott McQuarrie for the lost contents of the home. The Government also argued at trial that this amount was fraudulently inflated because Scott McQuarrie misrepresented the amount that he had paid for one of the items he was being compensated for (a hot tub).

Scott McQuarrie then requested that FSA provide him approximately $30,000 from the supervised bank account holding the funds related to the claim for loss of the structure. The Government argued at trial that Scott McQuarrie concealed from FSA that he had already received compensation for the contents of the home, and so FSA provided Scott McQuarrie a check based on the misapprehension that the check it previously received was meant to cover both the lost structure and lost contents. The funds from that check were deposited in David McQuarrie's account and then transferred to Yvonne McQuarrie's account.

The evidence presented at trial was more than sufficient for a jury to reasonably conclude that numerous mailings and wire communications occurred as a natural and inevitable result of the scheme to defraud. Scott McQuarrie initiated the scheme when he made his claims for compensation to the insurance companies. Those claims were made both electronically and via the mail. Similarly, the insurance agency mailed Scott McQuarrie the check for the contents. And, when the FSA provided Scott McQuarrie a check for the contents of the home, those funds were

transferred electronically between accounts. Many of these mailings and uses of the wire were, of themselves, innocent. But they were all likewise essential steps in the scheme to defraud and as such were reasonably foreseeable. *See United States v. Kuehnemund*, 208 F. App'x 371, 374 (6th Cir. 2006) ("[C]ourts have noted that use of the mails by an insurance company in response to a fraudulent claim submitted is foreseeable."). The evidence was sufficient for the jury to conclude that the jurisdictional element of mail and wire fraud was met.

David and Yvonne McQuarrie also argue that there was insufficient evidence admitted that David and Yvonne participated in the charged wire fraud scheme with intent to defraud. In response, the Government emphasizes that the fraudulently obtained check from the FSA was deposited in David McQuarrie's account, transferred to Yvonne McQuarrie's account, and then Yvonne wrote a check for a similar amount to the FSA to satisfy Scott McQuarrie's overdue annual loan amount. The Government argues:

> A reasonable jury could wonder how David and Yvonne McQuarrie would not question the legitimacy of Scott McQuarrie's acquisition of such a large check from FSA when he was in eminent risk of foreclose [sic] by FSA. A jury rationally could conclude that David and Yvonne McQuarrie's participation in the convoluted negotiation of that FSA check, and Yvonne McQuarrie's subsequent use of the proceeds of that check to make Scott McQuarrie's past-due farm payment to prevent FSA foreclosure with FSA funds, were manifestations of David and Yvonne McQuarrie's intent to defraud or their willful blindness that was the equivalent of intent.

Gov. Resp. Br. at 14, ECF No. 178.

Given the extraordinarily high standard which Defendants must meet to justify acquittal or a new trial, the Court agrees.

## B.

All three Defendants argue that the Court erred in making certain evidentiary rulings during trial. Because these rulings are inherently discretionary, "a new trial is not required unless

'substantial rights' of a party [were] affected." *United States v. Bonds*, 12 F.3d 540, 554 (6th Cir. 1993). "An erroneous evidentiary ruling amounts to reversible error, justifying a new trial, only if it was not harmless; that is, only if it affected the outcome of the trial." *Cummins v. BIC USA, Inc.*, 727 F.3d 506, 510 (6th Cir. 2013).

In his motion for acquittal or a new trial, Scott McQuarrie takes issue with several evidentiary rulings. First, he objects to the Court's refusal to permit defense counsel to introduce evidence that Scott McQuarrie sought in 2006 to receive debt relief from the FSA through a "conservation contract," not a restructuring of his existing loans. Similarly, the Court denied leave to introduce evidence that the "National Appeals Division of the Secretary of Agriculture previously denied FSA's intent to accelerate Defendant's loans in a 2010 written opinion that Defendant's application for servicing was timely filed as a request for a 'conservation contract.'" ECF No. 168 at 6. Scott contends that "[t]here records were relevant to help the jury understand the Defendant's intent, knowledge and purpose for signing another security agreement in 2011." *Id.* at 7.

But Scott McQuarrie has not explained in his motion nor in response to repeated inquiries during trial how this theory could serve as a defense to any charges. Counts One and Two of the fourth superseding indictment charge Scott McQuarrie with making false statements to the FSA, but both statutes would be violated by false statements in connection with a "conservation contract"[3] just as easily as they would a request for loan restructuring. *See* 18 U.S.C. § 1014 (criminalizing making a false statement "for the purpose of influencing in any way the action of the . . . Farm Credit Administration"); 18 U.S.C. § 1001(a)(2) (criminalizing making a materially

---

[3] Conservation contracts can be obtained pursuant to an FSA program whereby the FSA grants a loan principal reduction in exchange for an agreement not to plant on certain property.

false statement in any matter within the jurisdiction of the United States Government). These records were not relevant.

All three Defendants argue that the Court erred when it refused to permit introduction of evidence that Scott McQuarrie was in debt to his parents, despite the fact that Scott never identified his parents as creditors and his parents never filed a proof of claim in the bankruptcy proceedings. More specifically, David and Yvonne wished to admit an unauthenticated summary purportedly showing that David and Yvonne McQuarrie paid more money *to* Scott between 2011 and 2015 than Scott paid to them. The argument was carefully considered and the evidence was excluded because even if it was marginally relevant, the danger of unfair prejudice, jury confusion, and undue delay justified its exclusion pursuant to Federal Rule of Evidence 403.

And, as the Government asserts, this theory simply provides David and Yvonne McQuarrie with an additional motive for concealing Scott McQuarrie's assets from creditors who would have had priority over them. Given Scott McQuarrie's continual financial struggles and his large debt to his parents (taking Defendants' theory as true), David and Yvonne could scarcely claim ignorance that Scott McQuarrie owed considerable sums to other creditors. When the fact that David and Yvonne paid for both of Scott McQuarrie's bankruptcy proceedings is considered, the defense theory becomes incredible. While the evidence might have caused the jury to identify with the challenges of dealing with an undisciplined child, counsel could never identify why the evidence (even if they could have identified a means of authenticating the evidence) was capable of supporting a relevant defense. Defendants have provided no reason to believe that the exclusion of this evidence influenced the outcome of the trial.

Finally, Scott McQuarrie argues that the Court erred when it permitted the Government to play portions of a recorded interview between the case agent and Scott McQuarrie (containing

certain admissions), but denied Scott McQuarrie's request to play additional portions of the audio recording. Defendant's request was denied pursuant to Federal Rules of Evidence 801(d)(2) and 802 (governing hearsay), and Scott McQuarrie has not attempted to articulate any error in that ruling. He simply contends that, pursuant to the rule of completeness, more of the recording should have been played. During trial, the Court reviewed a transcript of the recording and found that the segments the defense wished to present did not reasonably address subjects excluded by the Government. To the contrary, the sections the Defendants sought to introduce would only have introduced irrelevant and confusing information. Given the other evidentiary barriers to the admission of the evidence, Scott McQuarrie has not explained why the exclusion constituted error. And, more importantly, he has not explained how the decision affected the outcome of the trial.

### C.

The next question is whether David and Yvonne suffered specific and compelling prejudice when they were jointly tried with their son. Defendants have simply fallen short of rigorous standard necessary to justify a new trial. In the pretrial order denying Defendants' motion for severance, the Court explained that the Government's theory of wrongdoing was that "David and Yvonne McQuarrie were intimately involved in Scott McQuarrie's alleged misfeasance." January 11, 2018, Op. & Order at 5, ECF No. 79. The evidence presented at trial and the jury's verdict confirmed that to be true. The jury found that all three Defendants conspired together to conceal Scott McQuarrie's assets from the bankruptcy court and that all three Defendants engaged in a wire fraud scheme. The extended timeline of these schemes and the interrelationship between the Defendants' alleged misconduct necessitated a joint trial.

Defendants argue that they were prejudiced because "[e]vidence was repeatedly ruled admissible against one or two of the defendants yet the Government made no effort to segregate

its use by the jury." ECF No. 167 at 5. Regardless of whether that is true, the Court repeatedly admonished the jury that certain evidence was admitted only against certain Defendants. Likewise, the jury instructions clearly informed the jury that they must consider the evidence separately for each crime and each Defendant. *See* Jury Instructions at 9, ECF No. 156 ("The defendants have all been charged with several crimes. The number of charges is no evidence of guilt, and this should not influence your decision in any way. And in our system of justice, guilt or innocence is personal and individual. It is your duty to separately consider the evidence against each defendant on each charge, and to return a separate verdict for each defendant on each charge. For each charge, you must decide whether the government has presented proof beyond a reasonable doubt that a particular defendant is guilty of a particular charge."). And, most importantly, there is strong evidence that the jury strictly complied with those instructions. The jury convicted Scott McQuarrie of both Counts Thirteen and Fourteen, but convicted his parents only of Count Fourteen. Regardless of the precise basis for this distinction by the jury, it is apparent that the jury considered the evidence for each count and each Defendant separately. Accordingly, Defendants have not shown "compelling, specific, and actual prejudice" from the Court's refusal to sever the trials. *Saadey*, 393 F.3d at 678.

## D.

Defendants' next argument is that the Government introduced a new factual theory of liability for the wire and mail fraud charges at trial. Defendants contend that this additional factual theory rendered the indictment duplicitous and constituted a variance from the fourth superseding indictment. Both arguments will be addressed in turn.

### 1.

On January 11, 2018, the Court ordered the Government to provide a bill of particulars for some of the counts in the then pending third superseding indictment, including Counts Thirteen and Fourteen (the mail and wire fraud counts). ECF No. 77. For both of those Counts, the Court directed the Government to disclose "the specific dates of the transactions in question." ECF No. 77 at 18. The Court also explained: "In their response to the motion to sever, the Government has provided a succinct summary of the factual basis for this Count. *See* Gov. Resp. Mot. Sever. at 6–7. Given those details, directing the Government to provide a bill of particulars which specifies the nature of the scheme would be redundant." *Id.* The portion of the response brief relied upon by the Court reads as follows:

> As discussed during the most recent meeting in chambers between the court and all counsel, Scott McQuarrie's house was pledged as collateral for a FSA loan and insured through David McQuarrie's insurance agency. After the house was destroyed by fire, Scott McQuarrie collected $30,000 by mail directly from the insurance company for lost contents. Scott McQuarrie also tricked FSA into paying him $30,000 for lost contents out of the joint insurance check sent by mail to FSA and Scott McQuarrie to replace the structure, rather than the contents, destroyed by the fire. The "double-dipped" $30,000 check from FSA was negotiated through and wire transferred between financial accounts held by Yvonne and David McQuarrie. Yvonne McQuarrie then promptly wrote a $28,000 check to FSA on Scott McQuarrie's behalf to prevent the impending foreclosure of Scott McQuarrie's FSA loans and the resulting loss of his farming assets. Furthermore, the McQuarries also falsely claimed to FSA that Scott McQuarrie had obtained the $28,000 by selling cattle to David McQuarrie and thereby kept FSA from liquidating the cattle (FSA's collateral) located on Scott McQuarrie's farm when Scott McQuarrie was again in default on his FSA loan.

Gov. Resp. Mot. Sever. at 6–7, ECF No. 66.

Later in January, the Government submitted the bill of particulars. Am. Bill Particulars, ECF No. 83. As to Counts Thirteen and Fourteen, the bill of particulars identified several relevant dates:

> The fire insurance claim was initiated on or about March 6, 2012, not 2013.

Additional documentation in support of the insurance claim was submitted by fax on or about August 21, 2012.

Insurance checks were dated and mailed on or about March 6, 2012, May 22, 2012, October 26, 2012 and March 18, 2013.

Electronic funds transfers were made between accounts on or about March 9, 2012, October 29, 2012, March 19, 2013, and April 23, 2013.

A check was provided to the Farm Services Agency on or about April 23, 2013.

Am. Bill Particulars at 3, ECF No. 83.

A second amended bill of particulars was issued on January 29, 2018. Sec. Am. Bill Particulars, ECF No. 93. The only relevant change in that updated bill of particulars was the disclosure that "[a]dditional documentation in support of the insurance claim" was also submitted by mail on February 18, 2013, and another insurance check was mailed on May 21, 2013. *Id.* at 3.

Defendants argue that, at trial, the Government varied from this disclosed factual theory because it argued that Scott McQuarrie also engaged in a scheme to defraud the insurance company, not just the FSA. Specifically, Defendants argue that the Government's initial theory for Counts Thirteen and Fourteen was that Scott McQuarrie "double-dipped" when he convinced the FSA to give him a check for the lost contents of his home after his insurance company had already done the same. At trial, "the court permitted the government to argue that Counts 13 and 14 were also based upon Defendants' receipt of a check from Nationwide Insurance for the replacement cost of a hot tub destroyed during the house fire." ECF No. 168 at 11. In other words, the Government argued at trial that the mail and wire fraud charges covered both (1) when Scott McQuarrie sent an altered document to his insurance company which falsely itemized the cost of a replacement hot tub and (2) when Scott McQuarrie persuaded FSA to reimburse him for the lost contents of his house based on the misrepresentation that his insurance company had not already done so. According to Defendants, this change in theory constituted a variance from the fourth

- 16 -

superseding indictment and amended bill of particulars. Defendants also argue that Counts Thirteen and Fourteen, as prosecuted by the Government at trial, were duplicitous.

## 2.

"Generally speaking, a variance 'occurs when the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment.'" *United States v. Budd*, 496 F.3d 517, 521 (6th Cir. 2007) (quoting *United States v. Prince*, 214 F.3d 740, 756–57 (6th Cir. 2000)). "Variances . . . are not *per se* prejudicial." *Id.* "'To obtain reversal of a conviction because of a variance between the indictment and the evidence produced at trial, a defendant must satisfy a two-prong test: (1) the variance must be demonstrated and (2) the variance must affect some substantial right of the defendant.'" *Id.* at 521–22 (quoting *Prince*, 214 F.3d at 757). "A substantial right is affected only when the defendant establishes prejudice in his ability to defend himself or to the overall fairness of the trial." *Prince*, 214 F.3d at 757.

The initial question is whether a variance occurred. The fourth superseding indictment merely charged the Defendants, in Count Thirteen, with devising and carrying out a scheme to defraud which involved "the use of the mail to send receipts to Scott McQuarrie's insurance company, and caused another to mail checks that were fire insurance proceeds." ECF No. 103 at 11–12. Count Fourteen is even less specific. It charged the Defendants with devising and carrying out a scheme to defraud which involve "the transmission of writings, signs and signals by means of wire communication in interstate commerce, that is communications by email, text, fax and telephone, and the electronic transfer of funds between financial accounts." *Id.* at 12. When considering only the allegations in the indictment, it cannot be said that the facts proved at trial were materially different. The mail fraud charge specifies both the mailings to the insurance

company and the corresponding checks for fire insurance proceeds as being part of the scheme to defraud. That is entirely consistent with the Government's dual theory that Defendants defrauded both the insurance company (through the altered hot tub receipt) and the FSA (by obtaining a fire insurance proceeds check through misrepresentations). Admittedly, Count Fourteen of the fourth superseding indictment merely recites the legal elements of the charged crime instead of the factual basis for the charge. But, as explained above, it is well settled law that the elements of mail fraud and wire fraud are identical except for the jurisdictional element. Because of that, Defendants (through counsel) were on notice that the factual theory for both Counts Thirteen and Fourteen was the same, especially because counsel were in possession of all the evidence furnished in discovery which supported the charges.

The potential variance arises when the bill of particulars is analyzed. As explained above, the Court (and Defendants) relied upon the Government's articulation of the factual theory underlying Counts Thirteen and Fourteen in determining whether additional disclosures were necessary. The Government's previous explanation (quoted above) does not mention the hot tub or any misrepresentations to the insurance company. However, as the Government explains, numerous pretrial disclosures by the Government provided notice to Defendants that Scott McQuarrie's representations to his insurance company were a focus of the case. The Government's witness list, produced on January 30, 2018, included the name of the man who sold the hot tub to Scott McQuarrie. The document (an estimate altered to look like a receipt) which Scott McQuarrie sent to his insurance company was included in the Government's exhibits, which were disclosed to Defendants prior to trial. As explained above, well before trial the Government produced a second amended bill of particulars which identified the date that the altered document was mailed and the date that the insurance check was mailed to Scott McQuarrie. While the amended bill of

particulars did not specify *why* those mailings were relevant, that level of specificity was not required. "[A] motion for a bill of particulars is "not meant as a tool for the defense to obtain detailed disclosure of all evidence held by the government before trial." *United States v. Salisbury*, 983 F.2d 1369, 1375 (6th Cir. 1993). And "a defendant is not entitled to discover all the overt acts that might be proven at trial." *Id.*

Thus, the facts proved at trial did not materially differ from those alleged in the indictment. At most, the theory the Government articulated in its brief opposing a motion for severance did not mention the hot tub receipt used to itemize Scott McQuarrie's purported loss for the insurance company. Because that articulation was relied on during the adjudication of the motion for a bill of particulars, that difference could arguably serve as the basis for a variance. *See United States v. Haskins*, 345 F.2d 111, 114 (6th Cir. 1965) ("When a bill of particulars has been furnished, the government is strictly limited to the particulars which it has specified."). But the Government's later amendment largely addressed the issue. While the second amended bill of particulars did not disclose the Government's theory in detail, it did identify the mailings which the Government believed composed the relevant transactions for the charges. Thus, Defendants were on notice that the mailing containing the altered hot tub estimate were relevant, even though the Government did not precisely explain to the Defendants *why* it was relevant. Given these disclosures, no variance occurred.

And even if the Government's admittedly sparse disclosures were insufficient, Defendants have not carried their burden of explaining how the variance prejudiced them. As explained above, the documents in question were provided to Defendants prior to trial, and their relevance was highlighted for Defendants before trial. To the extent Defendants' review of discovery did not put them on notice of this potential theory, the Government's disclosure of the case agent's grand jury

testimony on the eve of trial (pursuant to the Government *Jencks*'s obligations and the Court's order) would have been clearly sufficient. Thus, Defendants had at least constructive notice of the theory when trial began. Defendants have made no effort to articulate specific prejudice which arose because they had comparatively less time to prepare for this claim. For example, Defendants have not articulated any defense theory to the mail and wire fraud charges which they could have made, but did not for lack of notice and preparation. Because there was likely no variance and certainly no prejudice, a new trial is not warranted.

**3.**

Defendants also contend that Counts Thirteen and Fourteen were duplicitous for essentially the same reason. As explained above, "[a]n indictment is duplicitous if it sets forth separate and distinct crimes in one count." *Davis*, 306 F.3d at 415. "Duplicitous charges, however, are not necessarily fatal to an indictment." *Hood,* 210 F.3d at 662. If the issue is not raised before trial, then the inquiry focuses on "the harm stemming from the duplicitous indictment." *Kakos*, 483 F.3d at 444.

Defendants argue that Counts Thirteen and Fourteen were duplicitous because they contained "two different alleged offense[s], with two distinct victims." ECF No. 168 at 11. In response, the Government argues that both instances of alleged misconduct were part of the same general scheme to defraud.

"In reviewing an indictment for duplicity, [the] task is not to review the evidence presented at trial to determine whether it would support charging several crimes rather than just one, but rather solely to assess whether the indictment itself can be read to charge only one violation in each count." *United States v. Mastelotto*, 717 F.2d 1238, 1244 (9th Cir. 1983). *See also United States v. Dolan*, 99 F.3d 1140 at *3 (6th Cir. 1996) ("[I]f the indictment may be read to charge but

one crime in each count, the court will do so."). "Absent proof that the grand jury was improperly charged, the court must presume that the prosecutor and grand jury charged 'but one crime in each count of the indictment.'" *Dolan*, 99 F.3d at *3 (quoting *Mastelotto*, 717 F.2d at 1244)).

Here, Counts Thirteen and Fourteen can easily be read to charge one scheme to defraud which involved multiple misrepresentations. *See id.* at *4 (explaining that "the Fifth and Ninth Circuits have recognized that 'the defrauding of different people over an extended period of time, using different means and representations, may constitute but one scheme'" and concluding that the mail fraud charge in *Dolan* constituted a "unitary scheme to defraud") (quoting *Mastelotto*, 717 F.2d at 1244)). After his home burned in a fire, Scott McQuarrie concocted a scheme to obtain fire insurance proceeds to which he was not entitled. That scheme involved both misrepresentations to his insurer (to inflate their payment to him) and misrepresentations to the FSA (to solicit a payment from them). The indictment was not duplicitous.

To the extent Defendants argue that the jury may not have been unanimously agreed that either the misrepresentation regarding the hot tub or the misrepresentation to the FSA occurred, unanimity on that issue was not required. "While a jury must agree on all of the elements of an offense, it need not agree on the means by which all the elements were accomplished." *Dolan*, 99 F.3d 1140 at *4. *See also United States v. Schmeltz*, 667 F.3d 685, 687 (6th Cir. 2011) ("'[A]lthough a jury must unanimously find that the government has proven each element of a crime, it 'need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element.'") (quoting *United States v. Cromer*, 436 Fed. App'x 490, 493 (6th Cir. 2011)).

And, finally, to the extent Defendants believe that a separate unanimity instruction should have been given to the jury, no such instruction was necessary. "[A] defendant generally is not

entitled to a specific unanimity instruction unless '1) a count is extremely complex, 2) there is variance between the indictment and the proof at trial, or 3) there is a tangible risk of jury confusion.'" *Cromer*, 426 Fed. App'x at 493 (quoting *United States v. Sanderson*, 966 F.2d 184, 187 (6th Cir.1992)). The charged conduct here was not extremely complex. Defendants do not identify, and the Court did not observe, any jury confusion. The Court has already rejected Defendant's argument that a prejudicial variance occurred. And, most importantly, no such instruction was requested for Counts Thirteen and Fourteen prior to trial. Defendants' challenge to Counts Thirteen and Fourteen has no merit.

### E.

Finally, Scott McQuarrie argues that the Government improperly argued during closing arguments that "they would have played other portions of Defendant's recorded statement if the court believed they were permitted to by the rules of evidence." ECF No. 168 at 12. The Government strenuously objects to this characterization:

> The government submits that when the defendant supplies a transcript of the closing arguments, the transcript will reveal that during his closing argument, Scott McQuarrie told the jurors that they did not have all of the available evidence because the government had been allowed to play selected excerpts of his taped interview with McClutchey, while the defendant had not been allowed to present the parts of that interview that he wanted the jurors to hear. In response to that completely inappropriate argument, the government properly responded during its rebuttal argument that the court's role in the case was to apply the rules of evidence and the jury's job was to decide the case based on the evidence presented, without speculating regarding any information that the court had ruled should not be received in evidence.

ECF No. 180 at 24.

Scott McQuarrie has not submitted the transcript of closing arguments. Accordingly, the Court must rely on its memory and internal records of closing arguments. There was no improper argument by the Government. Scott McQuarrie's recorded statement was a subject of discussion

by both Scott McQuarrie and the Government during closing argument. During closing argument, Scott McQuarrie suggested to the jury that the Government played only three minutes of Scott McQuarrie's two hour statement in an attempt to "hide the ball." In its rebuttal, the Government accused Scott McQuarrie of playing fast and loose with the facts. The Government also reminded the jury that it is the Court that applies the Federal Rules of Evidence and that the jury was tasked with considering the evidence which was admitted.

The Government's rebuttal was not improper. The Government never suggested that the recorded statement included additional inculpatory information. Rather, the Government asserted that the excerpt of the statement was admitted in accordance with the rules of evidence and reminded the jury of their obligation to deliberate based only on the evidence which the Court had admitted. That admonition is consistent with the Sixth Circuit model instructions (provided to the jury in this case), and so it was not improper. *See* Model Instruction 1.04; ECF No. 156 at 4.

## III.

Accordingly, it is **ORDERED** that Defendants David and Yvonne McQuarrie's motion for acquittal, ECF No. 166, is **DENIED.**

It is further **ORDERED** that Defendants David and Yvonne McQuarrie's motion for a new trial, ECF No. 167, is **DENIED.**

It is further **ORDERED** that Defendant Scott McQuarrie's motion for acquittal and a new trial, ECF No. 168, is **DENIED.**


Dated: July 17, 2018                              s/Thomas L. Ludington
                                                  THOMAS L. LUDINGTON
                                                  United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 17, 2018.

s/Kelly Winslow
KELLY WINSLOW, Case Manager